UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MAURICE COLLINS,
        Plaintiff,
v.                                                             Case No. 19-C-858

MICHAEL KEMERLING, *et al.*,
        Defendants.

## DECISION AND ORDER

Plaintiff Maurice Collins, a Wisconsin state prisoner who is representing himself, filed this lawsuit under 42 U.S.C. § 1983. I screened the plaintiff's complaint and allowed him to proceed on Eighth Amendment clams against medical and state defendants who worked at his institution. After some of the defendants filed separate motions for summary judgment, the parties agreed to attempt to resolve the plaintiff's two pending cases through mediation. The court appointed counsel for the plaintiff and referred his cases to mediation. The plaintiff settled his claims with Nurse Practitioner Sandra McArdle and Nurse Penny Skaife, and I dismissed those defendants. The remaining defendants now move for summary judgment. ECF Nos. 47 & 75. As explained below, I will **GRANT** these motions and **DISMISS** this case.

### I. BACKGROUND[1]

**A.    The Parties**

The plaintiff has been incarcerated at the Wisconsin Secure Program Facility (WSPF) since May 2016. ECF No. 77, ¶ 1. He sues Nurses Michael Kemerling, Karen Lee, Sheryl

---

[1] Facts in this section are taken from the defendants' proposed findings of fact and declarations in support of their motions for summary judgment, ECF Nos. 49–50, 52 & 77–79; the plaintiff's response to the defendants' proposed facts, declaration in opposition, and supplemental proposed findings of fact, ECF Nos. 88–91; and the defendants' responses to the plaintiff's facts, ECF Nos. 100–101. I will consider each party's proposed facts only to the extent they are supported by evidence in the record. *See* Fed. R. Civ. P. 56(c)(1); Civil L. R. 56(b)(1)(C)(i) and (2)(B)(i)–(ii). I will deem admitted any uncontroverted fact and will consider arguments in the supporting

Kinyon, Tammy West, Beckey Kramer, and Erin Wehrle; Medical Program Assistance Associate Sarah Martin; and former Health Services Manager Jolinda Waterman (collectively, the State Defendants). *Id.*, ¶¶ 2–3, 5–7. The plaintiff also sues Dr. Eileen Gavin, a physician at WSPF. ECF No. 49, ¶ 3.[2]

**B.    WSPF's Health Services Unit**

The Health Services Unit (HSU) at WSPF includes advanced care providers and nursing staff, each of which have different responsibilities. ECF No. 77, ¶ 8. Advanced care providers (doctors, nurse practitioners, and physician assistants) render final treatment decisions and care plans, write prescriptions, make offsite referrals, and approve treatment from offsite providers. *Id.*, ¶ 11. Nursing staff triage inmates' health service requests for non-emergency medical treatment and provide medical care. *Id.*, ¶¶ 10, 15. The health services manager conducts administrative tasks and acts as liaison with other prison departments and outside providers. *Id.*, ¶ 12. The health services manager does not review requests for health services unless the nursing staff forwards one to her for a response. *Id.*, ¶ 13. Nor does the health services manager provide direct medical care to inmates, refer inmates to outside providers, or approve treatment recommendations from offsite providers. *Id.*, ¶ 14.

---

memoranda only to the extent they properly refer to each party's statement of facts. *See* Civil L. R. 56(b)(4)–(6).
    [2] Dr. Gavin moves to restrict public access to (1) her declaration in support of her summary judgment motion (ECF No. 52) and (2) her progress notes from various check-ins with the plaintiff (ECF No. 52-1). *See* ECF No. 51. Ordinarily, a party requesting to file documents under seal must show good cause for such restriction and file a redacted version for public viewing, if possible. *See* General L. R. 79(d)(1), (3). However, "[t]he strong presumption of public disclosure applies only to the materials that formed the basis of the parties' dispute and the district court's resolution." *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 548 (7th Cir. 2002). *See also City of Greenville, Ill. v. Syngenta Crop Prot.*, LLC, 764 F.3d 695, 698 (7th Cir. 2014). I will **DENY** the motion to restrict as to Gavin's declaration, as I have relied on that document in deciding these motions and conclude that the declaration does not contain any information worthy of long-term confidentiality. While I do not believe Dr. Gavin's notes are otherwise worthy of restriction, I did not rely on her notes as I did her declaration; because her notes therefore cannot aid the public's understanding of this decision, I will **GRANT** the motion as to her notes and restrict access to that filing.

Nursing staff and the health services manager defer to advanced care providers' medical decisions and have no authority to override or alter those decisions. *Id.*, ¶ 16.

The plaintiff disputes whether the nursing staff and the health service manager prescribe medication and states that Waterman's successor did prescribe medication. ECF No. 89, ¶¶ 9, 14. He cites generally his declaration in support without specifying the paragraph related to his dispute.

**C.     Medical Shoes at WSPF**

All WSPF inmates receive a pair of State-issued canvas shoes but may purchase other shoes through the institution's catalog. ECF No. 77, ¶ 17. The HSU offers customized, medical orthopedic shoes, which may be provided only with authorization from the DOC's Medical Director or other DOC physicians. *Id.*, ¶ 18; ECF No. 79-5 at 8.

The HSU also offers black Velcro shoes, often called "medical shoes." ECF No. 77, ¶ 19. The HSU receives up to ten requests per month for medical shoes, which Waterman states inmates used as a tradeable good. *Id.*, ¶ 20; ECF No. 78, ¶ 19. When new shoes arrive, HSU staff write the receiving inmate's name on the bottom of his medical shoes and send the shoes to the property department with a copy of the medical restriction[3] that authorizes issuance of the medical shoes to the inmate. ECF No. 77, ¶ 21. Security staff contact the HSU when they find medical shoes with an inmate to whom they do not belong. *Id.*, ¶ 22. The plaintiff disputes that these shoes were a tradeable good and insists that inmates instead sold their used, personal shoes. ECF No. 89, ¶ 20.

The State Defendants state that medical shoes must be approved by the Special Needs Committee, a group of health services and security staff the Warden selects to review

---

[3] Special needs and accommodations are documented on a DOC3332B form, titled "Medical Restrictions/Special Needs." ECF No. 78, ¶ 27. This kind of special authorization is referred to as a "medical restriction" by the parties.

3

special needs and accommodations. ECF No. 77, ¶ 23. The Committee follows the criteria in Health Services Policy and Procedure 300:07 to determine whether an inmate qualifies for a special item or accommodation. *Id.*; ECF No. 79-5. Policy 300:07 states that if an inmate is not able to wear the State-issued shoes because of "a significant medical condition," that affects the inmate's "activities of daily living," the prison must provide an alternative shoe. ECF No. 77, ¶ 24; ECF No. 79-5 at 8. According to Waterman, "activities of daily living" include bathing, dressing, grooming, eating, and walking but do not include recreational activities, like running or high-impact sports. ECF No. 77, ¶ 26; ECF No. 78, ¶ 24. Policy 300:07 states that issuances of alternative shoes should be "very limited and determined on a case by case basis through the established committee/nurse review." ECF No. 77, ¶ 27; ECF No. 79-5 at 8. The policy prohibits the HSU from approving or providing "comfort items" that are not shown to provide a medical benefit or treat medical conditions. ECF No. 77, ¶ 28; ECF No. 79-5 at 2–3. Dr. Gavin states that she was not on the Committee and could not order a medical accommodation without Committee authorization. ECF No. 49, ¶ 9.

The plaintiff disputes that Policy 300:07 covers the black Velcro shoes, which he insists are State-issued shoes provided without Committee approval. ECF No. 88, ¶ 8; ECF No. 89, ¶¶ 23, 27; ECF No. 91, ¶¶ 116–117. The plaintiff asserts the policy covers only customized, special orthotic shoes. ECF No. 90, ¶ 62. Yet it is undisputed the plaintiff received black Velcro shoes through a medical restriction to treat pain in his legs and feet. *Id.*, ¶ 63; ECF No. 100, ¶¶ 62–63. The plaintiff states he "would never wear a Velcro shoe [as] opposed to his own personal shoes." ECF No. 89, ¶ 20. Yet he also states his personal shoes caused him pain and his feet to swell up if he wore them "on a consistent basis," so

4

he was issued black Velcro shoes to resolve those symptoms. ECF No. 90, ¶ 64; ECF No. 91, ¶ 118.

**D.    The Plaintiff's Shoes**

On December 3, 2016, a nurse (who is not a defendant) saw the plaintiff to address pain in his feet. ECF No. 77, ¶ 30. On December 9, 2016, the nurse measured the plaintiff's feet, and a nurse practitioner (also not a defendant) ordered the black Velcro (medical) shoes, which were issued to the plaintiff on December 27, 2016. *Id.*, ¶ 31; ECF No. 79-1 at 71, 123. The State Defendants state the nurse practitioner should not have ordered the shoes for the plaintiff and instead should have first received approval through the Special Needs Committee. ECF No. 77, ¶ 32. The defendants cite Policy 300:07, which provides, "Prescribing practitioners shall refer items to the committee/nurse for review of special needs rather than write orders for specific items." *Id.*; ECF No. 79-5 at 2. The nurse practitioner did not enter a "stop date" for the plaintiff's shoe accommodation, which Waterman states was the practice of providers in 2016. *Id.*, ¶¶ 33–34. This meant HSU staff did not annually reassess the plaintiff's need for the accommodation once he was issued the shoes in December 2016. *Id.*, ¶ 35.

In 2017 and 2018, the plaintiff saw HSU staff several times for complaints of foot pain. ECF No. 77, ¶ 36. Staff issued him medications and creams and performed an x-ray, which revealed no issues in his feet. *Id.*, ¶¶ 37–38. In February 2017, he was referred for physical therapy and to a podiatrist, who he saw several times in 2017 and 2018. *Id.*, ¶¶ 39–40. The podiatrist diagnosed the plaintiff with plantar fasciitis and peripheral neuropathy, which Waterman states can be treated with pain management and use of an appropriate shoe purchased through WSPF's vendor catalog. *Id.*, ¶¶ 44–47. The podiatrist did not recommend

medical shoes but recommended arch supports and Gabapentin, which provided "marked improvement." *Id.*, ¶¶ 41–42; ECF No. 79-1 at 169.

The plaintiff maintains that any doctor or nurse practitioner can provide the black Velcro shoes without prior Committee authorization. ECF No. 89, ¶ 32. He states that because these shoes are State-issued, he also did not need annual reassessment to keep the shoes. *Id.*, ¶¶ 34–35. The plaintiff asserts his condition had improved by the time he saw the podiatrist, who had no need to recommend medical shoes. *Id.*, ¶ 41.

### E.  The January 2019 Shoe Incident

From January 20 to 23, 2019, the plaintiff was placed on observation status after expressing suicidal thoughts. ECF No. 77, ¶¶ 49, 52. Observation cells have large windows that allow staff to easily see inside the cell to perform visual checks on the inmate every fifteen minutes. *Id.*, ¶ 51; ECF No. 79-7.

It is disputed whether the plaintiff had his medical shoes before entering observation. According to the plaintiff, he left his medical shoes outside his observation-cell door on January 20, 2019. ECF No. 90, ¶ 11. The plaintiff states he was unable to find his shoes once released from the cell, and a corrections officer said he would look for them. ECF No. 90, ¶ 12. According to Waterman, the plaintiff initially stated a security staff member took the shoes and gave them to another inmate. ECF No. 77, ¶ 53; ECF No. 78, ¶ 46. The plaintiff, similarly, asserts a staff member took the shoes and gave them to the wrong person. ECF No. 89, ¶ 53. He attaches an affidavit from D'Angelo Key, who states a corrections officer gave him the plaintiff's black Velcro shoes the week of January 27, 2019. ECF No. 91-1 at 5. Key further states the plaintiff did not give him the shoes. *Id.*

On January 24 and 27, 2019, the plaintiff submitted health service requests for a new pair of medical shoes. ECF No. 77, ¶ 60; ECF No. 79-3 at 61; ECF No. 79-4 at 6. Nurse

6

Kemerling responded and told the plaintiff the shoes were not with the HSU, he needed to contact security, and the HSU would not provide new shoes each time the plaintiff was placed on observation status. ECF No. 77, ¶ 60; ECF No. 79-3 at 61; ECF No. 79-4 at 6. The plaintiff submitted another request for shoes stating his feet hurt, and nursing staff scheduled an appointment. ECF No. 77, ¶ 61; ECF No. 79-3 at 279.

In February 2019, WSPF security staff conducted a shakedown, locating and confiscating the plaintiff's medical shoes from Key's cell.[4] ECF No. 77, ¶¶ 67–68. According to Waterman, Nurse Practitioner McArdle told Waterman that McArdle intended to discontinue the plaintiff's order for medical shoes because she believed he had misappropriated them. *Id.*, ¶ 70; ECF No. 78, ¶ 59. Waterman did not document the conversation, which the plaintiff asserts did not occur. ECF No. 78, ¶ 59; ECF No. 89, ¶¶ 70–71.

Waterman states she relayed McArdle's decision to HSU staff and instructed them to tell the plaintiff he would not receive replacement shoes. ECF No. 77, ¶ 72. Waterman also responded to some of the plaintiff's requests about his shoes herself. *Id.*, ¶ 63. On March 13, 2019, Waterman responded to the plaintiff's February 4, 2019 request, "No new shoes – yours were in another patient's cell." *Id.*, ¶ 64; ECF No. 79-3 at 274. She similarly responded to the plaintiff's February 10, 2019 request, stating that he would not get new shoes because he "knowingly and repeatedly requested replacement of shoes you knew were in another inmates cell." ECF No. 77, ¶ 73; ECF No. 79-3 at 267. The plaintiff points to a March 26, 2019 memorandum from McArdle stating, "Since recently order for shoes [sic], it has come to my attention that your previous special shoes were used inappropriately by sharing/giving

---

[4] The parties dispute whether the shakedown occurred in early or mid-February.

them to another inmate, thus the order for shoes will be discontinued." ECF No. 89, ¶¶ 70–73; ECF No. 91-1 at 90 (also at ECF No. 79-3 at 111).

On February 22, 2019, the plaintiff submitted another health services request complaining about foot and leg pain and requesting new shoes. ECF No. 77, ¶ 74; ECF No. 79-3 at 254. Waterman again responded, telling the plaintiff he would not get black Velcro shoes because they "are for inmate workers" and because he "gave [his] shoes away to another inmate." ECF No. 77, ¶ 74; ECF No. 79-3 at 254. Two days later the plaintiff submitted yet another request for shoes, which request Waterman again denied because he "gave them away" and stated the "issue is completely addressed." ECF No. 77, ¶ 77; ECF No. 79-3 at 252.

Each of the State Defendants responded to at least one of the plaintiff's continued requests for new shoes in February and March 2019, explaining that his shoe order was discontinued, he would not receive another pair, he had no medical need for them under Policy 300:07, he should refer to previous responses, and/or he could follow-up with his provider at a later appointment. ECF No. 77, ¶¶ 79–82, 84–86. Kinyon on one occasion told the plaintiff his shoes were for work, which Waterman describes as "a simple mistake." *Id.*, ¶ 83. The plaintiff states that he has never had an institutional job, for which inmates are sometimes given the same black Velcro shoes. ECF No. 90, ¶¶ 30–31. The defendants dispute whether the plaintiff had an institutional job but do not dispute inmate workers may receive the shoes. ECF No. 100, ¶¶ 30–31. Other HSU staff responded to more of the plaintiff's requests for shoes and continued to explain that he had no medical order for the shoes and would not receive a replacement pair. ECF No 77, ¶ 87.

According to Waterman, McArdle did not officially discontinue the plaintiff's medical shoes until March 5, 2019, though Waterman earlier instructed HSU staff to inform the

8

plaintiff his shoe restriction had ended. ECF No. 77, ¶ 78; ECF No. 49, ¶ 16; ECF No. 50-2, ¶ 3. The plaintiff's medical records support that statement and show the medical shoes were discontinued March 5, 2019. ECF No. 79-6 at 2. During a medical appointment the same day, Nurse Kinyon explained to the plaintiff that he no longer met the criteria for HSU shoes and did not currently have an order for them. ECF No. 91-1 at 106. The plaintiff states Kinyon told him she would talk to Waterman about the restriction, but the notes from the appointment do not support this. ECF No. 90, ¶ 38. In a March 12, 2019 request for health services, the plaintiff asked when his medical restriction was discontinued. ECF No. 90, ¶ 46; ECF No. 79-3 at 217. Nurse Kramer responded, "It appears late February and you were also told this on 3-5-19." ECF No. 79-3 at 217.

Waterman states that she and the nursing staff deferred to McArdle's decisions (as an advanced care provider) to discontinue the plaintiff's shoe order. ECF No. 77, ¶ 90. Waterman asserts than neither she nor the nursing staff could or did discontinue his shoe order; only an advanced care provider (like McArdle) could do so. *Id.*, ¶¶ 91–93. The plaintiff asserts McArdle's March 26, 2019 memorandum shows she did not discontinue his medical restriction until that date—when he asserts she first became aware that his shoes were found in another inmate's cell—and that "someone else discontinued the order on March 5, 2019." ECF No. 88, ¶ 16. The plaintiff insists Waterman discontinued his shoes on March 5, 2019, despite her assertion that she was unable to. ECF No. 89, ¶ 91. He cites progress notes and responses to his health services requests that state the shoes were discontinued "per HSU Manager" or "According to Waterman." ECF No. 91-1 at 64–65.

Waterman states she did not speak to the plaintiff or inmate Key about the shoes because it is security's responsibility to investigate misuse or misappropriation, such as the plaintiff's purported misuse of his shoes. ECF No. 77, ¶¶ 94–95. Waterman and the nursing

9

staff relied on security staff's information and McArdle's decisions about the plaintiff's shoes. *Id.*, ¶ 100–101. The plaintiff asserts Waterman refused to listen to him and instructed nursing staff not to return his shoes "to punish" him. ECF No. 89, ¶ 94. He also asserts Waterman lied to the inmate complaint department when it contacted Waterman about the plaintiff's inmate complaints regarding his medical shoes. ECF No. 90, ¶ 61. The plaintiff cites the decision from the Office of the Secretary dismissing his complaint and concluding "the fact remains there is no medical documentation that verifies the need for the shoes to be provided." ECF No. 91-1 at 16. The State Defendants dispute Waterman lied and assert the plaintiff has no evidence to support his belief she did. ECF No. 100, ¶ 61.

In August 2019, after Waterman was no longer the Health Services Manager, the plaintiff began a hunger strike over his lack of medical shoes. ECF No. 77, ¶ 97. Waterman's replacement (who is not a defendant) requested that an advanced care provider order the plaintiff a new pair of medical shoes, which he received later that month. *Id.*, ¶¶ 98–99; ECF No. 79-2 at 400, 404; ECF No. 79-6 at 2. The plaintiff's medical records showing his August 2019 medical shoe restriction state, "This is to be worn as his state shoe." ECF No. 79-6 at 2. That note does not appear with his initial December 2016 medical shoe restriction. *Id.* The plaintiff insists he received new medical shoes only after showing HSU staff a copy of his complaint in this lawsuit. ECF No. 89, ¶ 98; ECF No. 90, ¶ 67; ECF No. 91, ¶ 122.

F. Dr. Gavin's Treatment

On January 11, 2019, the plaintiff met with Dr. Gavin to treat his shoulder pain. ECF No. 49, ¶ 18. Dr. Gavin examined the plaintiff and prescribed medication to treat his discomfort. *Id.* Dr. Gavin saw the plaintiff about a month later for continued shoulder pain. *Id.*, ¶ 19. Dr. Gavin again examined the plaintiff, instructed him to hydrate, and prescribed range of motion exercises. *Id.* She also ordered an x-ray of the plaintiff's shoulder and

prescribed muscle relaxants. *Id.*, ¶ 20. On March 25, 2019, Dr. Gavin saw the plaintiff for a third visit about his continued left-arm pain. *Id.*, ¶ 21. She prescribed physical therapy and a cortisone injection and advised the plaintiff to perform his exercises. *Id.* Also during the March 25, 2019 visit, she examined the plaintiff for complaints of swelling in his right breast. *Id.*, ¶ 22. She concluded the growth was benign but ordered an ultrasound and laboratory tests for further investigation. *Id.*

During the March 25, 2019 appointment, the plaintiff also brought up his discontinued shoe accommodation and stated his feet were hurting. ECF No. 49, ¶ 23. Dr. Gavin states she believed the accommodation required approval by the Special Needs Committee and that his issue had been addressed by other medical professionals at the institution. *Id.*, ¶ 24. Dr. Gavin explained that she was not involved in decisions about his shoe accommodation and advised him to go through the Department of Corrections for further action. *Id.*, ¶ 25. It is undisputed Dr. Gavin did not discontinue the plaintiff's medical shoe restriction. *Id,*, ¶ 17; ECF No. 88, ¶ 17.

The plaintiff insists Dr. Gavin had the authority to reinstate his shoe accommodation without Committee authorization but refused to do so. ECF No. 88, ¶ 23. He states Dr. Gavin refused even to evaluate his feet despite his complaints of pain. *Id.*, ¶ 25. The plaintiff states, but Dr. Gavin disputes, that she told him he needed to purchase shoes that would better support his legs and feet because he was not getting the medical shoes. ECF No. 90, ¶ 57; ECF No. 101, ¶ 57. He asserts Dr. Gavin reissued him the black Velcro shoe restriction in August 2019, but Dr. Gavin disputes this. ECF No. 90, ¶ 68; ECF No. 101, ¶ 68.

## II. DISCUSSION

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a);

11

Case 2:19-cv-00858-LA    Filed 02/24/21    Page 11 of 20    Document 103

*see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* "[D]isputed facts that are not outcome-determinative are not material and will not preclude summary judgment." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

Many of the plaintiff's purported factual disputes involve immaterial issues, for example which shoes were traded by inmates or when the February 2019 shakedown occurred. Other disputes he supports only with a statement in his declaration, which largely relies on speculation or conclusory assertions on matters about which the plaintiff lacks personal knowledge. Those statements, without supporting evidence elsewhere in the record, do not create a genuine dispute of fact that may defeat summary judgment. *See Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003).

A.  **Eighth Amendment Standard**

I review the plaintiff's claim regarding the denial of proper medical care under the Eighth Amendment, which "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including ... grossly inadequate medical care." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). Not "every claim by a

prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). To establish a valid Eighth Amendment claim, the plaintiff must show both that he "suffered from an objectively serious medical condition" and that the defendants were "deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). *See also Estelle*, 429 U.S. at 103. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Farmer*, 511 U.S. at 835. A prison official shows deliberate indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015) (citing *Farmer*, 511 U.S. at 837).

The State Defendants contend that the plaintiff's foot pain does not qualify as an objectively serious medical condition. ECF No. 76 at 6–7. They note that, despite his complaints of pain, the plaintiff continued to play basketball and got into fights with other inmates. *Id.* The State Defendants submitted a disc with video from April 7, 2019, purportedly showing the plaintiff playing basketball with other inmates for several minutes before getting into a fight with inmate Key (the inmate in whose cell the plaintiff's shoes were found). ECF No. 79-9; ECF No. 79-11; ECF No. 81. The State Defendants also note that the podiatrist who evaluated the plaintiff's foot did not recommend medical shoes, suggesting his condition was not severe enough to warrant advanced treatment. ECF No. 76 at 7. Finally, the State Defendants assert that the plaintiff's continued requests for medical treatment *after* he received the medical shoes in December 2016 show the medical shoes did not help his pain. *Id.*

While the video evidence provides some support for the State Defendants' position, their final point is irrelevant. Whether the medical shoes resolved the plaintiff's pain is

13

unrelated to whether his condition as a whole evinced an objectively serious medical condition. That the plaintiff needed additional treatment after receiving the medical shoes at least suggests his pain was serious. For purposes of this decision, I will consider the plaintiff's foot issues an objectively serious medical condition. Accordingly, the question is whether each defendant was aware of, and deliberately indifferent to, the plaintiff's condition.

### B. Nursing Staff

The nursing staff's only involvement in the plaintiff's claims was their responses to his numerous requests for health services in which they informed him that the restriction for the medical shoes had been discontinued. The nursing staff were entitled to defer to the instructions of their superiors—Health Services Manager Waterman or Nurse Practitioner McArdle—unless it was apparent their instructions "will likely harm the patient . . . [or] ignore obvious risks to an inmate's health." *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012) (quoting *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010), and *Rice ex rel. Rice v. Corr. Med. Servs.,* 675 F.3d 650, 683 (7th Cir. 2012)).

The nursing staff did not ignore the plaintiff's requests or his condition. They merely informed him that he would no longer receive the medical shoes and could follow-up at a later appointment. It is undisputed that nursing staff had no authority to place or remove the plaintiff's medical restriction for the black Velcro shoes. Only an advanced medical care provider had that authority. There is no evidence any of the nursing staff removed the plaintiff's medical shoe restriction improperly. Nor is there any evidence they could have provided the plaintiff the shoes he requested on their own without authorization from an advanced care provider and/or a medical restriction in the plaintiff's medical file. Once Waterman instructed nursing staff that McArdle had ended the plaintiff's medical shoe restriction, they appropriately informed the plaintiff of this fact. The plaintiff asserts that some

14

of the responses denying his requests were sent before his medical shoe restriction ended on March 5, 2019. But as noted, the nursing staff were following Waterman's instructions and had no authority to provide the plaintiff medical shoes without an order to do so. The plaintiff has submitted no evidence showing the nursing staff could have or should have done more in response to his requests for medical shoes.

Because the evidence shows the nursing staff did all that was in their authority and responsibility to do in response to the plaintiff's health services requests in February and March 2019, no reasonable jury could conclude they were deliberately indifferent to his complaints. Accordingly, I will grant the motion for summary judgment as regards Nurses Kemerling, Lee, Kinyon, West, Kramer, and Wehrle and Medical Program Assistance Associate Martin.

### C. Health Services Manager Waterman

The parties dispute who discontinued the plaintiff's medical shoe restriction and when. Waterman states she spoke with Nurse Practitioner McArdle in February 2019, after the shoes were found during the shakedown, and McArdle told Waterman she would discontinue the plaintiff's order for medical shoes because of the believed misappropriation. Waterman did not document that conversation, but afterwards she directed HSU staff to tell the plaintiff he would not receive replacement shoes. Nor do the plaintiff's medical records confirm who discontinued the shoes, but they do show his shoes were officially discontinued on March 5, 2019. *See* ECF No. 79-6 at 2. McArdle informed the plaintiff in a March 26, 2019 memorandum that the shoes *would be* discontinued, even though that memorandum was sent three weeks after the shoes had already been discontinued. *Compare id*., *with* ECF No. 91-1 at 90.

15

The plaintiff insists McArdle did not discontinue his shoe order until she sent the March 26, 2019 memorandum. Yet he also insists someone, probably Waterman, removed his medical restriction for the shoes following his March 5, 2019 appointment with Nurse Kinyon. As evidence, the plaintiff cites progress notes or responses to his health services requests that state that "According to Waterman" or "per Waterman," the shoes were discontinued. But those remarks do not mean Waterman was responsible for discontinuing the order, which she did not have the authority to do. They show only that Waterman informed the nurse writing the note or response that the shoe order was discontinued.

It is undisputed that only an advanced care provider, such as a doctor or nurse practitioner, can discontinue an order for medical shoes. *See* ECF No. 89 at 19 (indicating no objection to ECF No. 77, ¶ 93). The plaintiff points to no evidence that anyone other than McArdle ordered or discontinued his medical shoes. Although he disputes Waterman spoke with McArdle about discontinuing the restriction, he lacks personal knowledge about that event. His belief Waterman discontinued his restriction is only speculation, which does not create a genuine dispute of fact. *See Ammerman v. Singleton*, 817 F.App'x 265, 268 (7th Cir. 2020) (citing *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014)); Fed. R. Civ. P. 56(c)(4).

Based on the record, Nurse Practitioner McArdle discontinued the plaintiff's medical shoe restriction based on security staff's suggestion that the plaintiff misappropriated the shoes. Security staff members are not defendants in this lawsuit. After McArdle decided to discontinue the plaintiff's medical shoe restriction, Waterman relayed that information to HSU staff and instructed them to tell the plaintiff he was no longer entitled to medical shoes. It was reasonable for Waterman to rely on the information given to her and instruct her staff accordingly. Even if security staff were wrong about the plaintiff misappropriating his shoes,

16

it was not Waterman's responsibility as HSU manager to review security staff's investigation or question the decisions of an advanced care provider like McArdle. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("[N]o prisoner is entitled to insist that one employee do another's job."). The plaintiff's claim that his medical shoe restriction was wrongfully discontinued is properly directed not at Waterman but at McArdle, with whom the plaintiff has settled. ECF No. 86.

There is evidence Waterman instructed the nursing staff to tell the plaintiff his medical shoe restriction had been discontinued before March 5, 2019, when it was officially discontinued. But the evidence also shows McArdle earlier informed Waterman she would discontinue the plaintiff's shoe restriction. Waterman was entitled to rely on that information from McArdle when instructing her staff to deny the plaintiff's requests for replacement shoes, just as the nursing staff were entitled to rely on Waterman's instructions. *See Holloway*, 700 F.3d at 1075; *Burks*, 555 F.3d at 595. If Waterman prematurely instructed her staff to deny the plaintiff's requests for replacement shoes, her actions may have violated prison policy. But § 1983 protects against violations of only constitutional rights and not department or prison regulations and policies. *See Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) (quoting *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003)); *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001). Violating HSU or institutional policies would not provide a constitutional basis for Waterman's liability.

Nor is it relevant that the plaintiff's medical shoe restriction was reimplemented in August 2019, after Waterman no longer was the health services manager. Whether the black Velcro shoes were a State-issued shoe or required Committee authorization, it is undisputed the plaintiff's shoes were found in another inmate's cell, and consequently McArdle discontinued his shoe restriction. That a different advanced care provider later reinstated

17

the plaintiff's restriction for medical shoes does not change that fact that Waterman was entitled to follow McArdle's directions in February and March 2019 discontinuing his restriction. *See Pyles*, 771 F.3d at 409 (noting that disagreement between medical professionals about treatment generally does not establish an Eighth Amendment violation).

No reasonable jury could conclude that Waterman's reliance on information and orders from other prison departments and staff constitutes deliberate indifference to the plaintiff's medical issues in violation of the Eighth Amendment. Accordingly, I will grant the motion for summary judgment as to Waterman.

### D.     Dr. Gavin

It is undisputed that Dr. Gavin was not involved in discontinuing the plaintiff's initial medical shoe restriction in March 2019. Dr. Gavin states she did not thoroughly examine the plaintiff's foot because the issue had been addressed in his many health services requests and appointments over the past two months. Dr. Gavin also believed she lacked the authority to reinstate his shoes under Policy 300:07. *See* ECF No. 79-5 at 2. The plaintiff insists, however, that Dr. Gavin had the authority to reissue the shoes to him because she issued him medical shoes in August 2019.

Regardless, the evidence in the record supports Dr. Gavin's declaration that the plaintiff did not have a designated medical restriction for issuance of special shoes when she examined him on March 25, 2019, and that she did not have authority to reissue the shoes to him. Even if Dr. Gavin was incorrect about her authority to reissue the plaintiff medical shoes, her mistaken belief on the subject would not amount to deliberate indifference. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) ("[W]ithout more, a mistake in professional judgment cannot be deliberate indifference."); *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996) ("[A] defendant's inadvertent error,

negligence or even ordinary malpractice is insufficient to rise to the level of an Eighth Amendment constitutional violation.").

Because Dr. Gavin believed she did not have the authority to reissue the plaintiff medical shoes when she saw him on March 25, 2019 and this belief was not unreasonable, she cannot be held liable for not doing so. No reasonable jury could conclude that she acted with deliberate indifference based on that belief, mistaken or not. Accordingly, I will grant the motion for summary judgment as to Dr. Gavin.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the defendants' motions for summary judgment (ECF Nos. 47 & 75) are **GRANTED**.[5] This case is **DISMISSED**. The Clerk of Court shall enter final judgment accordingly.

**IT IS FURTHER ORDERED** that Dr. Gavin's motion to restrict documents (ECF No. 51) is **GRANTED in part** and **DENIED in part**. **The Clerk shall remove the "Restricted" designation from the filing at ECF No. 52**. The filing at ECF No. 52-1 shall remain restricted.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rules of Appellate Procedure 3 & 4. I may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

---

[5] Because I am granting the defendants' motions on the merits, I do not address their arguments that they are entitled to qualified immunity.

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. I may not extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin, this 24th day of February, 2021.

                                                  <u>s/Lynn Adelman</u>
                                                  LYNN ADELMAN
                                                  United States District Judge